## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**BARRY F. MESSINGER, Administrator of the Estate of**
**PATRICK JOSEPH MESSINGER, THE DECEDENT, deceased**

> *Plaintiff,*

                                                    **Case No.**

**V.**                                                   **DEMAND FOR TRIAL BY JURY**

**MICHAEL MOORE,**
**Individually and as Sheriff for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                           **Portsmouth, VA 23704**

**MARVIN WATERS,**
**Individually and as Undersheriff and Colonel for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                           **Portsmouth, VA 23704**

**K.S. LEAZER,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                           **Portsmouth, VA 23704**

**J.L SPIVEY,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                           **Portsmouth, VA 23704**

**P. CINTRON,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                           **Portsmouth, VA 23704**

**D. EDWARDS,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                           **Portsmouth, VA 23704**

**T. BRANHAM,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**R. COARDES,**
**Individually and as former Sergeant for the City of Portsmouth,**

        **SERVE AT:  2501 James Madison Blvd.**
                    **Virginia Beach, VA 23456**

**M. HERSEY,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**C. MATTHEWS,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**MICHALSKI,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**Q. DAWSON,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**P. DEAVER,**
**Individually and as a Deputy for the City of Portsmouth**

        **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**SGT. J.A. CASHWELL,**
**Individually and as a Deputy for the City of Portsmouth,**

        **SERVE AT:  701 Crawford Street**
                    **Portsmouth, VA 23704**

**MAJOR KELLER,**
**Individually and as a Major for the City of Portsmouth,**

       **SERVE AT:  701 Crawford Street**
                   **Portsmouth, VA 23704**

**CAPTAIN FORD,**
**Individually and as a Captain for the City of Portsmouth,**

       **SERVE AT:  701 Crawford Street**
                   **Portsmouth, VA 23704**

**CAPTAIN SUGG,**
**Individually and as a Captain for the City of Portsmouth,**

       **SERVE AT:  701 Crawford Street**
                   **Portsmouth, VA 23704**

**SGT ARMENTROUT,**
**Individually and as a Sergeant for the City of Portsmouth,**

       **SERVE AT:  701 Crawford Street**
                   **Portsmouth, VA 23704**

**LT. G. EVERETT**
**Individually and as a Lieutenant for the City of Portsmouth,**

       **SERVE AT:  701 Crawford Street**
                   **Portsmouth, VA 23704**

**CORRECT CARE SOLUTIONS,**

       **SERVE AT:  701 Crawford Street**
                   **Portsmouth, VA 23704**

**GWENDOLYN MCMURRIN, LPN,**
**Individually and as a Licensed Practical Nurse for Correct Care Solutions,**

       **SERVE AT:  701 Crawford Street**
                   **Portsmouth, VA 23704**

**NINA M. WILLIAMS, MENTAL HEALTH PROFESSIONAL,**
**Individually and as an employee for Correct Care Solutions,**

       **SERVE AT:  701 Crawford Street,**
                   **Portsmouth, VA 23704**

**FELICIA GOODE-ALSTORK, LPN,**
**Individually and as a Licensed Practical Nurse for Correct Care Solutions,**

        **SERVE AT:  701 Crawford Street,**
                       **Portsmouth, VA 23704**

**DAWN CHAPMAN, LPN,**
**Individually and as a Licensed Practical Nurse for Correct Care Solutions,**

        **SERVE AT:  701 Crawford Street**
                       **Portsmouth, VA 23704**

**PAUL BELL, RN,**
**Individually and as a Registered Nurse for Correct Care Solutions,**

        **SERVE AT:  3829 Long Point Road**
                       **Portsmouth, VA 23703**

**D. BOUTTE, RN,**
**Individually and as a Registered Nurse for Correct Care Solutions,**

        **SERVE AT:  701 Crawford Street**
                       **Portsmouth, VA 23704**

**L. MCDANIELS, LPN,**
**Individually and as a Licensed Practical Nurse for Correct Care Solutions,**

        **SERVE AT:  701 Crawford Street**
                       **Portsmouth, VA 23704**

        *Defendants.*

## **COMPLAINT**

        COMES NOW Plaintiff BARRY MESSINGER, administrator of the estate of PATRICK

JOSPEH MESSINGER, Deceased, by counsel, pursuant to Virginia Code § 8.01-50 et. seq., 42

U.S.C. § 1983, and Virginia statutory and common law, and moves this Court for judgment

against the defendants, jointly and severally; and in support of her Complaint, states as follows:

## I.   **PARTIES**

1. At all relevant times, Plaintiff Barry Messinger, was a citizen and resident of Cranford, New Jersey.  Plaintiff is the father of the decedent, Patrick Joseph Messinger ("the decedent"), and has qualified in the Chesapeake Circuit Court as the administrator of the decedent's estate. The plaintiff brings suit in his representative capacity on the behalf of the decedent's minor child as the statutory beneficiary: Hayden Messinger.  Upon information and belief, Bentley [Last Name Unknown at this time] may also be a statutory beneficiary.

2. At all relevant times, the decedent was in the custody and control of the Portsmouth City Jail; the Portsmouth Sheriff's Office; various Deputies, Sergeants, Lieutenants; and various nurses, and/or employees of Correct Care Solutions, all of whom were on duty at the time of the decedent's custody in the Portsmouth City Jail through the time of his attempted suicide on January 9, 2019 and subsequent death on January 11, 2019.

3. At all relevant times, Defendants Sheriff Michael Moore ("Moore") and Undersheriff Colonel Marvin Waters ("Waters"), were employed as the Sheriff and Undersheriff for the City of Portsmouth, and were responsible for the operation and maintenance of the Portsmouth City Jail, to include the care of the inmates incarcerated at the jail in which the decedent was incarcerated and died, and both of whom acted within the scope of his employment, agency, and servitude with the Sheriff's Office.

4. The following named deputies were sworn Sheriff's deputies and sergeants were employed by the sheriff, were on-duty, and were responsible for the decedent during his incarceration at the Portsmouth City Jail, to include but not limited to, Deputy K.S. Leezer, Deputy J.L. Spivey, Deputy P. Cintron, Deputy D. Edwards, Deputy J.L. Spivey, Deputy T. Branham, Sergeant Coardes, Deputy M. Hersey, Deputy C. Matthews, Deputy Michalski, Deputy Q. Dawson,

5

Deputy P. Deaver, and Sergeant J.A. Cashwell.

5. Upon information and belief, the following Major, Captains, Lieutenants, and Sergeant were employed by the sheriff, were on-duty during the decedent's incarceration, and were responsible for the supervision of jail and ensuring that the decedent received the constitutional mandated medical care and monitoring, to include but not limited to, Major Keller, Captain Ford, Captain Sugg, Lt. G. Everett, and Sgt. Armentrout.

6. All of the said named deputies in paragraph 4 above were duly appointed and actively employed as sheriff's deputies and sergeants, acting within the scope of their employment, agency, and servitude with the Portsmouth's Sheriff's Office and under the authority of Defendant Michael Moore.  The aforementioned deputies with be referred to collectively herein as the "on-duty guards."

7. Defendant Correct Care Solutions is a Corporation Company under the laws of the State of Tennessee and licensed to do business in the Commonwealth of Virginia.

8. Upon information and belief, Correct Care Solutions entered into a contract with the Portsmouth Sheriff's Office to provide medical and mental health care to the inmates incarcerated at the Portsmouth City Jail.

9. At all times relevant to this Complaint, Defendants Gwendolyn McMurrin, LPN, Nina M. Williams, Felicia Goode-Alstork, LPN, Dawn Chapman, LPN, D. Bouette, RN, L. McDaniels, LPN, and Paul Bell, RN, were duly appointed and actively employed as nurses, licensed practitioners, and/or trained medical personnel, each acting within the scope of their employment, agency, and servitude for Correct Care Solutions.  The aforementioned defendants will be referred to collectively herein as the "medical personnel."

10. Defendant Moore, Defendant Waters, and the other Defendant Supervisors in Portsmouth

Sheriff's Office, are liable under state law for the acts and/or omissions of their deputies, sergeants, and lieutenants under the theory of supervisory liability. Moore and Waters are subject to supervisory liability under the Virginia wrongful death statute § 8.1-50 and under 42 U.S.C. § 1983 due to their supervisory indifference and/or tacit authorization the misconduct of his subordinates as specifically set out herein.

11. Correct Care Solutions is liable under state law for the acts and omissions of its staff under the theory of *respondeat superior*, as set out herein.

12. At all times relevant to this Complaint, the defendants acted pursuant to and under the color of state law, and pursuant to their authority as law enforcement personnel and medical personnel. The plaintiff sues all defendants in both their individual and their official capacities.

13. This claim is being brought pursuant to 42 U.S.C. § 1983, the Virginia Wrongful Death Statute, Va. Code § 8.01-50 et. seq., and Virginia common and statutory law. The allegations and factual contentions contained herein are likely to have further evidentiary support following a reasonable opportunity for further investigation or during the litigation's discovery process.

## II.     JURISDICTION

14. Jurisdiction exists in this case pursuant to the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. 1331, 1343. Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50 et seq., or, alternatively, pursuant to Virginia Code § 8.01-25 et seq. All relief available under the foregoing statutes is sought herein by the plaintiff.

## III.    VENUE

15. Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts

and omissions giving rise to the plaintiff's claims occurred in this district.

16. Assignment to the Norfolk Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to the plaintiff's claims occurred in this division.

## IV.   FACTUAL BACKGROUND

17. On or about January 6, 2019, at approximately 8:31 p.m., the decedent was booked into the Portsmouth City Jail by Booking Officer J.L. Spivey.  The plaintiff was processed by Intake Deputy K.S. Leazer.

18. During the intake process, the decedent advised Deputy Leazer and Deputy Spivey that he used at least one gram of heroin per day and 3 to 4 doses of Xanax per day.  In addition, the decedent told the deputies that he drank a 12-pack of alcohol per day, further acknowledging that he had a history of withdrawal with demonstrable symptoms when he stopped using alcohol and drugs.  The decedent stated that his withdrawal symptoms included sweats, vomiting, diarrhea, chills, anxiousness, and restless legs.

19. Decedent related to the deputies a history of mental health issues with use of medications, and the decedent demonstrated these issues during the intake process as set out below.

20.  During his processing, Deputy Leazer noted that the decedent appeared unusual in both appearance and behavior.  Deputy Leazer further noted that the decedent seemed overly tired and agitated.

21. At approximately 10:14 p.m. on January 6, 2019, Gwendolyn McMurrin, LPN, completed a receiving screening interview of the decedent, required by the policies and procedures of the jail and her employer.  During the screening interview, the decedent told McMurrin that he was prescribed Prozac and that he had a history of mental health treatment.

The decedent also told McMurrin that he injected one gram of heroin per day, took 3 to 4 Xanax per day, and consumed a 12-pack of beer per day, while again acknowledging a history of withdrawal symptoms including sweats, headache, hot/cold, and stomach pain.

22. During this medical screening, McMurrin's entries into the jail records provided that the decedent appeared angry, kept his head down during the entire interview, refused to make eye contact, had a flat affect, and appeared slow and lethargic.  The decedent advised McMurrin that he did not feel well, that he was sick, that his stomach was killing him, and that he went for a hospital visit that day for nausea and neck pain.

23. At the conclusion of the screening interview, and based upon the decedent's responses and McMurrin's observations, she determined that the decedent needed to be seen and examined by a mental health professional to determine whether the decedent needed any further course of treatment to address his then-existing mental and physical condition.

24. Contrary to McMurrin's determination that the decedent needed to be seen by a mental health professional, the decedent was never seen or examined by a mental health professional before he attempted suicide on January 9, 2019, and subsequently died on January 11, 2019.

25. McMurrin recommended that the decedent be housed in general population.

26. Upon information and belief, two days had passed before, on January 8, 2019, Nina Williams, who is believed to be a Mental Health Professional, caused a note to be filed that said "MHC reviewed MH referral.  MHC consulted charge nurse yesterday and f/up w/HRRJ to determine if IM had an incarceration hx and MH tx w/Prozac.  IM last at HRRJ 8/2015.  IMHA scheduled.  No other MH tx indicated at this time."  Williams' entry form also included the words "Chronic," "Psych," and "Bipolar disorder, unspecified."

27. At no time did Williams assess whether the decedent needed immediate mental health

treatment.  Williams and McMurrin failed to ensure that the decedent was actually evaluated by a mental health professional before his attempted suicide, during a period of time in which the defendants knew, or through the exercise of reasonable care should have known, that the decedent would be suffering from symptoms of withdrawal, had a history of mental health treatment, actively took mental health medications before his incarceration, and had a documented abnormal appearance.  Neither Williams nor McMurrin ever gave the decedent his prescription Prozac.

28. The record reflects that at some time before his suicide on January 9, 2019, the decedent was seen by Felicia Goode-Alstork, LPN.  Goode-Alstork created an entry into jail records *after* the decedent was found hanging in his cell.  The entry purported that Goode-Astork saw the decedent at approximately 10:00 a.m. on January 9, 2019, and that the decedent requested a bottom bunk bed due to his left hand being paralyzed.  Goode-Alstork documented that the decedent was placed in isolation until the decedent was seen by a medical doctor.  Goode-Alstork's untimely entry also listed Patient Problems, including "Chronic," "Psych," and "Bipolar Disorder."

29. Upon information and belief, the decedent was placed in isolation during the morning hours of January 9, 2019.

30. Upon information and belief, Goode-Alstork failed to timely communicate the fact that the decedent was placed in isolation to the Watch Commander or any other jail deputies, leaving the decedent to his own devices at a time when his withdrawal symptoms and his quickly deteriorating physical and mental health significantly caused the decedent to act to end his life in his isolated state.

31. It would appear from the record that the fact that the decedent was placed in isolation was

not reported to and/or reviewed by the Watch Commander, Defendant Cashwell, until after the decedent was found hanging in his cell.

32. The records reviewed to date appear to show that when Goode-Alstork placed the decedent in isolation, and that this fact was never documented until after the decedent was found alone, hanging in his cell by Defendant Edwards.

33. Goode-Alstork's failure to document the decedent's isolated segregation was in violation of the policies of Correct Care Solutions and the Jail.  Upon information and belief, decedent was never checked on from the time he was placed in his isolated cell until he was found hanging by a bed sheet on January 9, 2019.

34. Despite being in custody for 3 full days, with full knowledge of the decedent's history of mental illness, added with the knowledge of the fact that the decedent was going to be suffering from withdrawal symptoms when he began to detox from his ingestion of alcohol and drugs, the decedent was never seen by a mental health professional ordered by Nurse McMurrin while in the custody of the jail, and the defendants placed the decedent in an isolation cell, without any monitoring, evaluation, or treatment, where he remained in his depressed mental state and physically isolated until he attempted suicide.

35. The records received and reviewed to date fail to document whether any of the named deputies or medical personnel ever checked on the decedent at any time following his placement in the isolation cell.  The decedent was in his isolation cell alone, without anyone checking on him.

36. Defendants were legally required to coordinate, facilitate, and provide mental health treatment and evaluation with a medical professional, given the decedent's mental and physical state at the time of his custody, when the defendants had already determined that mental health

11

intervention was already necessary for the decedent's well-being.

37.   Defendants Leazer, Spivey, Cintron, Edwards, Branham, Coardes, Hersey, Matthews, Michalski, Dawson, Deaver, and Cashwell were on-duty and tasked with maintaining the health and welfare of the inmates in custody of the Portsmouth City Jail at the time of the subject unconstitutional acts and/or omissions.

38. Upon information and belief, Deputy Cintron and Deputy Edwards, were tasked with performing rounds to check the health and safety of inmates in the decedent's area of the jail on the day the decedent was placed in isolation, as required by the written jail policies and procedures.

39. The written record will reflect that for at least 40 minutes, and possibly longer, no deputy walked past the decedent's cell nor checked on the health and welfare of the decedent while he was isolated from all jail population, permitting him, in his agitated state of mind, to twist and tie a bed sheet around his neck where he hung unnoticed for at least 40 minutes.

40. Deputy Edwards found the decedent hanging from the cell bars at approximately 2:30 p.m. on January 9, 2019.

41. Upon information and belief, the on-duty guards cut the decedent down.  Jail medical personnel and on-duty guards attempted resuscitation until emergency responders arrived and transported the decedent to Sentara Norfolk General Hospital.  The decedent never regained consciousness, dying two days later at Sentara Norfolk General Hospital.

42. An autopsy performed by licensed medical examiner, Dr. Wendy Gunther, on March 4, 2019, found that the decedent had the presence of methamphetamine and amphetamine in his blood.  Dr. Gunther determined that the cause of the decedent's death was suicide by hanging.

43. Upon information and belief, the actions of the Defendants, as contained herein,

constituted violations of the written policies of the jail and Correct Care Solutions and/or constituted violations of the standard of care required under the Eighth and Fourteenth Amendments of the United States Constitution.

44. Upon informing the plaintiff of his son's death, Defendant Waters honestly and candidly admitted to the plaintiff that the new administration conducted its own investigation of past jail deaths involving inmates, finding that the Correct Care staff working in the jail and/or the sheriff's staff had a history of failing to meet accepted standards. The investigation revealed past instances of lying and manipulating surveillance video and other evidence, in an attempt to cover up negligent acts. Defendants Waters also stated that his investigations of past death occurring at the Portsmouth City Jail revealed inconsistencies in what the Correct Care staff and/or jail staff said happened versus what the investigation found to have actually happened.

45. Plaintiff asserts that Sheriff Moore and Colonel Waters knew, or should have known, that Correct Care Solutions, and the sheriff personnel, had a history of failing to uphold minimal constitutional standard of care for inmates housed at the Portsmouth Jail.

46. In his conversation with the plaintiff, Defendant Waters acknowledged a previous incident, which occurred in January 2018, in which proper and acceptable standards were not met when Jail and Correct Care staff failed to evaluate and monitor an unknown inmate in the Portsmouth City Jail. This failure subsequently led to the inmate successfully committing suicide as happened in the subject case.

47. Additionally, Defendant Waters disclosed an incident, which occurred in August 2016, in which an individual was not monitored and/or treated in accordance with the proper standards, which resulted in the death of another inmate in the Portsmouth Jail. Waters stated that employees in the jail falsified records to cover up the violations by Correct Care and jail

13

employees.

48. Upon information and belief, Defendant Waters and Moore were aware that inmate Pamela Riddick died in the Portsmouth City Jail in August 2017, after being denied the medical care and monitoring necessary to have saved her life.  The jail and Correct Care staff failed to monitor or provide any medical treatment before the decedent's death.  The jail staff responded by falsifying records to cover up their wrong-doing.

49. The Board of Corrections investigated and confirmed the that the jail staff and Correct Care employees at the Portsmouth City Jail violated Virginia Administrative Codes and the jail's written policies in the treatment of inmates, which resulted in the death of Pamela Renee Riddick, and placed the jail on probation for the same.

50. Upon information and belief, the unconstitutional actions and omissions were not adequately addressed by Moore and Waters, given that the same employees still worked at the jail and the unconstitutional practices continued up to the time of the decedent's death.

51. On July 28, 2016, Kendra Nelson died of fibrinous pericarditis with pericardial effusion at the Portsmouth City Jail.  The jail and Correct Care staff ignored Nelson's medical complaints and obvious, serious withdrawal symptoms until Nelson died on the jail floor.

52. Upon information and belief, individuals involved in the subject suit were involved in the care and monitoring during the prior incidents in which inmates died and were still working for the jail at the time of the subject suicide and some of which are defendants to this suit.  Moore and Waters failed to appropriately address the ongoing violations in the jail, resulting in ongoing unconstitutional conduct in the jail, including at the time of the decedent's death.

53. Upon information and belief, Moore and Waters were aware of prior instances of Correct Care Solutions violating the rights of inmates in jails in Virginia:

14

a) In March of 2008, Laquan Norman died of a cerebral hemorrhage while incarcerated in the Norfolk City Jail.  At the time of his death, Correct Care Solutions had a contract to provide medical services to the jail.  Upon information and belief, Correct Care Solutions and its employees failed to provide adequate medical treatment to Mr. Norman resulting in his death;

b) On August 2, 2008, Valorie Burris died of a brain hemorrhage while in custody at the Alexandria City Adult Detention Center.  At the time of her death, Correct Care Solutions had a contract to provide medical services to the jail.  Correct Care Solutions and its employees failed to provide adequate medical treatment and ignored serious medical symptoms, including tremors, dehydration, heroin withdrawal symptoms, and loss of consciousness.  Correct Care Solutions's negligence in the treatment of Ms. Burris was the proximate cause of her death;

c) On August 2, 2014, Erin Jenkins died of a perforated duodenal ulcer while in custody at the Richmond City Justice Center. At the time of her death, Correct Care Solutions had a contract to provide medical services to the jail.  Correct Care Solutions and its employees failed to provide adequate medical treatment and ignored serious medical symptoms including dehydration, confusion, hallucinations, and extreme weight loss.  Correct Care Solutions's negligence in the treatment of Ms. Jenkins was the proximate cause of her death;

d) On February 9, 2015, Shannon Crane died of hypertensive cardiomyopathy while in custody at the Riverside Regional Jail in Prince George, Virginia.  At the time of his death, Correct Care Solutions had a contract to provide medical

services to the jail.  Correct Care Solutions and its employees failed to provide adequate medical treatment and ignored serious medical symptoms including hypoxia.  Correct Care Solutions's negligence in the treatment of Mr. Crane was the proximate cause of her death.

## V.    COUNT 1: WRONGFUL DEATH: ON-DUTY GUARDS' NEGLIGENCE

54. Paragraphs 1 through 53 are incorporated by reference herein.

55. At all relevant times, the on-duty guards were engaged in duties of law enforcement and operation of the jail and had a duty to exercise reasonable care in their treatment of the decedent.

56. Each of the named defendants herein, through their acts and/or omissions as set out herein, violated public policy, procedures, and standards, as well as the Sheriff's Office written policies and procedures in place to ensure the health and well-being of its inmates while incarcerated.

57. At all relevant times, on-duty guards should have known that the decedent was at risk of suicide because of his known extensive drug history, withdrawal history, history of mental health treatment, known prescriptions for mental health medication, documented demeanor on intake and during health evaluations, and placement in isolation, and should have taken steps to ensure proper evaluation and monitoring of the decedent.

58. Notwithstanding their duties, the defendants breached the standard of care when they:

    a.  Negligently placed the decedent in isolation without notifying the deputies responsible for monitoring the decedent's well-being and without notifying jail supervisors;

    b.  Negligently failed to appropriately monitor the decedent while he was housed in isolation;

16

    c.   Negligently failed to walk the post for at least 40 minutes in violation of jail standards and the General Post Orders Procedure in the Portsmouth Jail's Policies and Provisions;

    d.   Negligently failed to provide the decedent with the appropriate mental health evaluation(s) and treatment as indicated by his appearance and documented history of drug use, alcohol use, prescribed mental health medication, and history of mental health treatment;

    e.   Negligently failed to provide the decedent proper medical evaluation(s) and treatment for his obvious drug and alcohol withdrawal symptoms;

    f.   Negligently failed to provide the decedent with necessary medications;

    g.   Negligently failed to take all reasonable and necessary steps to prevent the decedent's death;

    h.   Negligently failed to house the decedent in a proper cell for close monitoring and failed to ensure the decedent did not have access to items which allowed him to take his life, as required by jail standards and the Portsmouth City Jail Policies and Procedures.

59. The acts and/or omissions as set out herein as to the on-duty guards were undertaken in the course of their employment with the Sheriff for the City of Portsmouth, and said acts and/or omissions are hereby imputed to the named Defendants Michael Moore and Marvin Waters, Sheriff and Undersheriff for the City of Portsmouth and the Portsmouth Sheriff's Office due to Moore and Water's failure to supervise the employees and the failure to correct the known unconstitutional practices.

60. Each of the named defendants herein, through their acts and/or omissions as set out

herein, violated either public policy and procedures and/or sheriff's office policies and procedures created to ensure the health and well-being of its inmates while incarcerated.

61. As a direct and proximate result of the on-duty guards' and/or its agents' omissions and negligence, the decedent attempted suicide on January 9, 2019 and subsequently died on January 11, 2019.

62. As a further direct and proximate result of the negligence and gross disregard for the decedent's mental health and risk of suicide, Defendants, jointly and severally, caused the decedent to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, all of which resulted in the decedent's death.

## VI.    COUNT II: ON-DUTY GUARDS' GROSS NEGLIGENCE

63. Paragraphs 1 through 62 are incorporated by reference herein.

64.  The conduct of the on-duty guards, as set out above, was grossly negligent, willful, and reckless in that the on-duty guards were aware that the decedent had known daily drug and alcohol history, known withdrawal history, a known history of mental health treatment, a known ongoing history of prescriptions for mental health medication, and a known and observed abnormal demeanor on intake and over the course of the decedent's custody, and placed the decedent in isolation, failing to ensure that the decedent received proper mental and physical health evaluations, monitoring, and treatment.

65. The acts and/or omissions as set out herein, as to the on-duty guards, were undertaken in the course of their employment with the Sheriff for the City of Portsmouth, and that said acts and/or omissions are hereby imputed to the named Defendants Michael Moore and Marvin Waters, as Sheriff and Undersheriff for the City of Portsmouth and the Portsmouth Sheriff's Office, due to Moore and Waters' failure to supervise the employees and failure to correct the

18

known unconstitutional practices.

66. Each of the named defendants herein, through their acts and/or omissions as set out herein, violated either public policy and procedures, or the Sheriff's Office written policy and procedures created to ensure the health and well-being of its inmates while incarcerated.

67. The attempt to create, modify, and/or correct jail records regarding the decedent's placement into isolation after the decedent's death in this instance demonstrates the defendants' deliberate indifference and/or gross negligence, warranting the relief requested.

68. As a direct and proximate result of the defendants' gross negligence, the decedent attempted suicide on January 9, 2019 and subsequently died on January 11, 2019.

69. As a further direct and proximate result of the defendants' gross negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, all of which resulted in the decedent hanging himself in his cell.

**VII.   COUNT III: ON-DUTY GUARDS' § 1983 VIOLATIONS – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED**

70. Paragraphs 1 through 69 are incorporated by reference herein.

71. At the time of the events giving rise to this litigation, the on-duty guards were acting in their individual capacities, as employees of the Portsmouth Sheriff's Office, and under the color of state law.

72. As discussed herein, the decedent had an obvious serious medical need, which was observed and documented by the defendants.  The symptoms of the serious medical need were documented by Defendants Leazer and McMurrin on intake and were therefore known to employees of the Sheriff's Office and employees of Correct Care Solutions.

73. The conduct of the on-duty guards, as set out above, shows their deliberate indifference to the decedent's mental and physical health needs, including a failure to evaluate, monitor, and

treat the decedent's serious medical needs, during his confinement.  The on-duty guards failed to provide appropriate treatment for the decedent's withdrawal, and failed to offer basic mental health treatment and monitoring necessary to prevent the decedent's suicide, violating the restriction on cruel and unusual punishment provided by the Eighth and Fourteenth Amendment of the United States Constitution.

74. The acts and/or omissions as set out herein as to the on-duty guards were committed in the course of their employment with the Sheriff for the City of Portsmouth, and said acts and/or omissions are hereby imputed to the named Defendants Michael Moore and Marvin Waters, as Sheriff and Undersheriff for the City of Portsmouth and the Portsmouth Sheriff's Office, due to Moore and Water's failure to supervise the employees and the failure to correct the known unconstitutional practices.

75. As a direct and proximate result of the defendants' deliberate indifference to serious medical need, the decedent attempted suicide on January 9, 2019 and subsequently died on January 11, 2019.

76. As a further direct and proximate result of the defendants' deliberate indifference, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, all of which resulted in the decedent's attempted suicide and subsequent death.

**VIII.**   **COUNT IV: NEGLIGENCE OF MICHAEL MOORE AND MARVIN WATERS**

77. Paragraphs 1 through 76 are incorporated by reference herein.

78. At all relevant times, Defendants Moore and Waters, individually and through the supervision of their employees, agents, and servants, including the on-duty guards and medical personnel, were acting under the color of state law in operating the Portsmouth City Jail and had

a duty to exercise reasonable care in handling inmates incarcerated at the jail, including the decedent.

79. At all relevant times, Defendants Moore and Waters had a duty to train and supervise their employees, agents, and servants at the Sheriff's Office, including the on-duty guards and medical personnel, to ensure that they were fit and able to deal with situations that may arise during the course of their employment with the Sheriff's Office, to include providing proper physical and mental health treatment and monitoring inmates for illness.  The aforementioned duties include providing treatment, evaluation, and monitoring for inmates suffering from drug and/or alcohol withdrawal.  Moore and Waters knew, or should have known, that an inmate who experiences withdraw symptoms, who has a known history of mental illness and medications, who is not provided his medications, and who placed in isolation, is particularly prone to committing suicide.

80. At all relevant times, Defendants Moore and Waters, individually and through the supervision of their employees, agents, and servants, including on-duty guards and medical personnel, knew or should have known that the decedent was in distress and at risk for suicide and needed proper mental and physical health evaluations and monitoring to prevent death. Moore and Waters, as well as the other defendants tasked the supervision of jail employees, individually and through the supervision of their employees, agents, and servants, had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and intentionally, knowingly, and/or recklessly failed and/or refused to do so.

81. Notwithstanding his duties, Defendants Moore and Waters individually and through the failure to supervise their employees, agents, servants, including on-duty guard defendants:

      a.   Negligently, and with deliberate indifference, failed to provide physical and

mental health treatment while he was in the custody of the jail;

b. Negligently, and with deliberate indifference, failed to provide sufficient monitoring while the decedent was in the custody of the jail;

c. Negligently failed to adequately instruct, control, discipline, train, and supervise the on-duty guards, medical personnel, and staff, on a continuous basis, on the proper policy and procedures accordingly to jail standards for treating and monitoring inmates who are at risk of suicide;

d. Directly or indirectly approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of his employees, agents, and servants, including the on-duty guards and medical personnel defendants;

e. Were otherwise negligent in depriving the decedent of his rights, privileges, and immunities secured by the United States Constitution and the laws of the United States.

82. Defendant Waters admitted to the plaintiff after the decedent's death that the jail medical staff and/or jail staff had a history of failing to meet accepted standards, and subsequently lying and manipulating surveillance video to cover up their failures.  Defendant Waters also stated that his investigations of past deaths occurring at the Portsmouth City Jail revealed inconsistencies in what Correct Care Staff and/or jail staff said happened versus what the investigation found to have actually happened.  In spite of having this information, Moore and Waters allowed the same individuals involved in prior misconduct to commit the same acts and/or omissions in the care and monitoring of the decedent, directly resulting in the decedent's attempted suicide and death.

83. Despite knowledge that their subordinates were engaged in conduct posing a pervasive and unreasonable risk of constitutional injury to inmates like the decedent, Defendants Moore,

Waters, and supervisory employees under their direction responded with such inadequate supervision and instruction as to show deliberate indifference to and tacit authorization of the practice of providing inadequate medical treatment and monitoring within the jail.  This negligent supervision directly resulted in the defendant subordinates continuing their unconstitutional conduct, which resulted in the decedent's.

84. As a direct and proximate result of the negligence of Moore and Waters, the decedent was permitted to be left in isolation in a deteriorating mental and physical state, allowing him to attempt suicide on January 9, 2019, which caused his death on January 11, 2019.

85. As a further direct and proximate result of Moore and Water's negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, prior to his attempting suicide which caused his death.

86. At all relevant times, Sheriff Moore and Colonel Waters acted within the scope of their employment, in servitude to the Portsmouth Sheriff's Office.

## IX.    COUNT V: GROSS NEGLIGENCE OF MICHAEL MOORE AND MARVIN WATERS

87. Paragraphs 1 through 86 are incorporated for reference herein.

88. The conduct and omissions of Defendants Moore and Waters, as set out above, was grossly negligent, willful, and reckless, in that they, through the failure to supervise their employees, agents, and servants, including the on-duty guards and medical personnel, intentionally ignored evidence that the decedent was at risk for suicide.  Despite readily available resources to provide mental health treatment and monitoring for the decedent, Moore and Waters, through the failure to supervise their employees, agents, and servants, including the on-duty guard and medical personnel, acted in a grossly negligent manner by failing to expend the minimal amount of effort necessary to avoid the wrongs inflicted on the decedent.

89. The attempt to create records relating to the decedent's incarceration after the decedent's death, and widespread practice of doing so in the Portsmouth City Jail, demonstrates the defendants' deliberate indifference and/or gross negligence, warranting relief requested.

90. As a direct and proximate result of Moore and Waters' gross negligence, the decedent attempted suicide on January 9, 2019 and subsequently died on January 11, 2019.

91. As a further direct and proximate result of Moore and Waters' negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, prior to his attempting suicide which caused his death.

92. At all relevant times, Sheriff Moore and Colonel Waters acted within the scope of his employment, in servitude to the Portsmouth Sheriff's Office.

## X. COUNT VI: MICHAEL MOORE AND MARVIN WATERS' § 1983 VIOLATIONS: POLICY AND/OR CUSTOM OF DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED

93. Paragraphs 1 through 93 are incorporated by reference herein.

94. At all relevant times, Sheriff Moore and Colonel Waters had a non-delegable duty to oversee the treatment of inmates at the Portsmouth City Jail and to ensure that the constitutional rights of inmates were not violated.

95. At all relevant times, Sheriff Moore and Colonel Waters had a non-delegable duty to oversee members of the Portsmouth Sheriff's Office and contractors working in the Portsmouth City Jail.

96. Upon information and belief, Sheriff Moore and Colonel Waters were in charge of assigning or overseeing the assignment of contracts for medical treatment within the jail.

97. Sheriff Moore and Colonel Waters knew, or should have known, that Correct Care Solutions and the sheriff personnel had a history of failing to uphold minimal constitutional

24

standard of care for inmates housed at the Portsmouth Jail.

98. Furthermore, upon information and belief, Defendant Waters admitted to the plaintiff after the decedent's death that the jail medical staff and/or jail staff had a history of failing to meet accepted standards, and subsequently lying and manipulating surveillance video to cover up their failures.  Defendant Waters also stated that his investigations of past deaths occurring at the Portsmouth City Jail revealed inconsistencies in what Correct Care Staff and/or jail staff said happened versus what the investigation found to have actually happened.  In spite of having this information, Moore and Waters allowed the same individuals involved in prior misconduct to commit the same acts and/or omissions in the care and monitoring of the decedent, directly resulting in the decedent's attempted suicide and death.

99. Upon information and belief, individuals involved in the care and monitoring during the prior incidents were still working for the jail at the time of the subject suicide and some of which are defendants to this suit.

100. In his conversation with the plaintiff, Defendant Waters acknowledged a previous incident, which occurred in January 2018, in which proper and acceptable standards were not met when Jail and Correct Care staff failed to evaluate and monitor an unknown inmate in the Portsmouth City Jail.  This failure subsequently led to the inmate successfully committing suicide as happened in the subject case.

101. Additionally, Defendant Waters disclosed an incident, which occurred in August 2016, in which an individual was not monitored and/or treated in accordance with the proper standards, which resulted in the death of another inmate in the Portsmouth Jail.  Waters stated that employees in the jail falsified records to cover up the violations by Correct Care and jail employees.

25

102. Upon information and belief, Defendant Waters and Moore were aware that inmate Pamela Riddick died in the Portsmouth City Jail in August 2017, after being denied the medical care and monitoring necessary to have saved her life.  The jail and Correct Care staff failed to monitor or provide any medical treatment before the decedent's death.  The jail staff responded by falsifying records to cover up their wrong-doing.

103. The Board of Corrections investigated and confirmed the that the jail staff and Correct Care employees at the Portsmouth City Jail violated Virginia Administrative Codes and the jail's written policies in the treatment of inmates, which resulted in the death of Pamela Renee Riddick, and placed the jail on probation for the same.

104. Upon information and belief, the unconstitutional actions and omissions were not adequately addressed by Moore and Waters, given that the same employees still worked at the jail and the unconstitutional practices continued up to the time of the decedent's death.

105. On July 28, 2016, Kendra Nelson died of fibrinous pericarditis with pericardial effusion at the Portsmouth City Jail.  The jail and Correct Care staff ignored Nelson's medical complaints and obvious, serious withdrawal symptoms until Nelson died on the jail floor.

106. The aforementioned examples, along with further examples of Correct Care violations discussed in paragraph 48 and other examples which may be revealed during the discovery process, acknowledges a policy, pattern, and practices of the sheriff office, its personnel and its agents, to include Defendant Correct Care Solutions and its employees, evidencing negligence and a gross disregard for the inmates care, needs, and maintenance for which they were jointly and severally responsible, including their failure to provide appropriate treatment and monitoring for inmates suffering from withdrawal, a failure to provide adequate medications needed by inmates, and a practice of falsifying records in an attempt to hide their failure to provide the

26

constitutionally mandated medical treatment and care for inmates mandated by law.

107. Defendant Moore and Colonel Waters, as well as their employees, agents, and servants knew, or should have known, about the numerous violations of inmates' constitutional rights by Sheriff employees and by employees of Correct Care Solutions.  Defendants Moore and Waters, as sheriff and undersheriff for the City of Portsmouth, knew or should have known that actions alleged were bound to occur, and should have taken steps to prevent such outcomes.

108. Defendant Moore and Waters, with the proper supervision and administrative oversight of their employees, agents, and servants, had the ability to prevent the actions described herein and, should have done so by exercising reasonable diligence and oversight, but intentionally, knowingly, and/or recklessly failed and/or refused to do so, resulting in the inmate's death.

109. Defendant Moore and Waters, in servitude to the Portsmouth Sheriff's Office, were aware of the alarming number of constitutional statutory and policy violations of the sheriff's office personnel and employees of its agent contractor Correct Care Solutions, and despite this knowledge, the defendants failed to implement adequate policies, training, and/or remedial measures to prevent continuing violations by sheriff's office personnel and Correct Care Solutions, resulting in a callous disregard for the constitutional rights of inmates, all of which constitute a policy or custom of deliberate indifference to the serious medical needs of inmates within the defendants sole and exclusive custody and care.

110. The creation of jail records after the decedent's death constitutes an act of deliberate indifference and/or gross negligence, warranting the relief requested.

111. The allegations and factual contentions contained herein are likely to have further evidentiary support following a reasonable opportunity for further investigation or during the litigation's discovery process.

## XI.   **COUNT VII: MEDICAL PERSONNEL'S NEGLIGENCE**

112. Paragraphs 1 through 111 are incorporated by reference herein.

113. At all relevant times, the medical staff personnel, including Nina Williams, Felicia Goode-Alstork, Dawn Chapman, and Paul Bell had a duty of reasonable care in their treatment of the decedent.

114. Paul Bell, as the Health Services Administrator for the Portsmouth City Jail, had a duty to supervise medical staff employed in the jail.  Upon information and belief, Paul Bell was the Health Services Administrator during the other instances of Constitutional violations in the Jail, as discussed *supra*, and had knowledge thereof.

115. As discussed herein, the decedent had an obvious serious medical need.  The symptoms of the serious medical need were documented in jail records by Defendants Leazer and McMurrin on intake and were therefore known to employees of the Sheriff's Office and employees of Correct Care Solutions.

116. At all relevant times, the medical staff personnel should have known that the decedent was in mental and physical distress given the decedent's known daily drug and alcohol history, withdrawal history, history of mental health treatment, history of prescriptions for mental health medication, abnormal demeanor on intake and over the course of his custody, and placement in isolation, and failed to ensure that the decedent received proper mental and physical health evaluations, monitoring, and treatment.

117. Notwithstanding their duties, the medical staff personnel;

    a.   Negligently failed to identify and take all necessary steps to treat or obtain treatment for the decedent's mental or physical health concerns;

    b.   Negligently failed to monitor the decedent in spite of his increased risk of suicide

as evidenced by the aforementioned risk factors;

c.   Negligently failed to advise the on-duty deputies of the decedent's risk factors;

d.   Negligently failed to advise the appropriate jail supervisors and deputies of the decedent's placement in isolation;

e.   Negligently failed to request that the decedent be examined by a mental health professional in a timely manner;

f.   Negligently failed to follow up to make certain that decedent was examined by a mental health professional;

g.   Negligently failed to house the decedent in a proper cell for appropriate monitoring, which was available for the decedent.

118. As a direct and proximate result of the medical personnel's negligence, the decedent attempted suicide on January 9, 2019 and subsequently committed suicide on January 11, 2019.

119. Each of the acts or omissions of the named medical personnel were committed within the course of their employment with Defendant, Correct Care Solutions, and thereby said acts or omissions are imputed to the named Defendant, Correct Care Solutions.

120. As a further direct and proximate result of the negligence of the defendant medical personnel, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, all of which resulted in the decedent hanging himself in his cell on January 9, 2019 and dying on January 11, 2019.

121. The plaintiff certifies that, pursuant to Virginia Code § 8.01-50.1, he has obtained a written certification from a qualified expert that the Medical Personnel Defendants and Correct Care Solutions' actions deviated from the applicable standard of care and that said deviation was the proximate cause of death of the decedent.

29

## XII.   COUNT VIII: THE MEDICAL PERSONNEL'S GROSS NEGLIGENCE

122. Paragraphs 1 through 121 are incorporated by reference herein.

123. The conduct of the medical personnel, as set out above, was grossly negligent, willful and reckless, in that they knew that the decedent was at-risk for suicide and took no steps to provide or coordinate mental health treatment nor facilitate appropriate monitoring of the decedent.  The medical personnel acted in a grossly negligent fashion by failing to provide necessary and adequate medical treatment, failing to provide necessary medications, allowing the decedent to remain in isolation without appropriate mental health treatment and/or monitoring, and failing to take any steps to prevent the decedent's death.

124. The medical personnel's conduct was clearly in reckless disregard of the rights of the decedent and was designed purely to inflict discomfort, humiliation, embarrassment, and other harm to the decedent.

125. The manufacturing of jail records to document historical facts after the decedent's death, when policy requires these facts to be documented at the time they occurred, constitutes an act of deliberate indifference and/or gross negligence, warranting the relief requested.

126. As a direct and proximate result of the defendants' gross negligence, the decedent died on January 11, 2019.

127. As a further direct and proximate result of the medical personnel's gross negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, all of which resulted in the decedent's attempted suicide and subsequent death.

## XIII.   COUNT IX: MEDICAL PERSONNEL'S § 1983 VIOLATIONS: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED

128. Paragraphs 1 through 127 are incorporated by reference herein.

30

129. At the time of the events giving rise to this litigation, the medical personnel were acting in their individual capacities and as agents for Sheriff Watson and the Portsmouth Sheriff's Office, and acted under color of state law.

130. Paul Bell, as the Health Services Administrator for the Portsmouth City Jail, had a duty to supervise medical staff employed in the jail.  Upon information and belief, Paul Bell was the Health Services Administrator during the other instances of Constitutional violations in the Jail, as discussed *supra*, and had knowledge thereof.

131. As acknowledged by Defendant Waters in a conversation with the plaintiff after the decedent's death, and as discussed in the factual discussion above, Correct Care Solutions had a history failing to provide sufficient treatment and monitoring of inmates in accordance with constitutional standards.  There was a clear, persistent, and widespread practice of ignoring the complaints and symptoms of inmates with drug addiction and completely failing to treat and monitor inmates who were going through withdrawal in the jail.  These failures implicate Correct Care and its supervisors, including Defendant Bell, in failing to properly and adequately train its employees to properly treat and monitor inmates in the jail showing signs of serious medical needs and/or creating an environment, through supervisory decisions, in which medical personnel were to ignore the needs of inmates.

132. The conduct of the medical personnel, as set out above, shows their deliberate indifference to the decedent's basic needs during his confinement.  The defendants, as alleged herein, failed to offer basic medical treatment, mental health treatment, and monitoring necessary to prevent the decedent's severe mental and physical health suffering and subsequent suicide. The conduct of the defendants offends the standards of basic human decency and violates the Constitutional restriction on cruel and unusual punishment and right to due process.

31

133. As a direct and proximate result of the defendants' deliberate indifference to a serious medical need, the decedent attempted to commit suicide on January 9, 2019 and subsequently died on January 11, 2019.

134. As a further direct and proximate result of the medical personnel's gross negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, all of which resulted in the decedent's attempted suicide and subsequent death.

**XIV.   COUNT X: CORRECT CARE SOLUTION'S NEGLIGENCE**

135. Paragraphs 1 through 134 are incorporated by reference herein.

136. At all relevant times, Correct Care Solutions, individually and through its employees, agents, and servants was engaged in the medial treatment of inmates and had a duty to act with reasonable care in its treatment of the decedent.

137. At all relevant times, Correct Care Solutions, individually and through its employees, agents, and servants, had a further duty to establish and enforce policies and procedures to avoid its medical staff personnel's violation of a prisoner's constitutional rights such as the right to due process under the Fifth and Fourteenth Amendment and the right against cruel and unusual punishment prescribed by the Eighth and Fourteenth Amendment.

138. At all relevant times, Correct Care Solutions had a duty to train and supervise the employees, agents, and servants, including the defendant medical personnel, and establish policies and procedures to be followed for treatment, supervision, and monitoring of an inmate, such as the decedent, who was demonstrating mental and physical health concerns and was at risk for suicide.

139. Correct Care Solutions breached this duty by failing to provide the decedent with

medical and mental health treatment, adequate monitoring, appropriate medication, and exhibiting a callous indifference for the decedent's well-being.

140. As a direct and proximate result of the defendants' negligence, the decedent attempted to commit suicide on January 9, 2019 and subsequently died on January 11, 2019.

141. As a further direct and proximate result of the medical personnel's negligence, the decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, all of which resulted in the decedent's attempted suicide and subsequent death.

## XV.    COUNT XI: CORRECT CARE SOLUTIONS' GROSS NEGLIGENCE

142. Paragraphs 1 through 141 are incorporated by reference herein.

143. Correct Care Solutions' conduct, as set out above, was grossly negligent, willful, and reckless, in that it, through its employees, agents, and servants, failed to take adequate steps to provide and/or facilitate mental health treatment and failed to provide and facilitate sufficient monitoring given the decedent's known mental health risk factors.

144. Correct Cares Solutions' conduct was in reckless disregard of the rights of the decedent. Its actions were designed purely to inflict discomfort, humiliation, embarrassment, and other harm to the decedent.

145. Correct Care Solutions otherwise acted with gross negligence, depriving the decedent of her rights, privileges, and immunities secured by the United States Constitution or laws of the United States.

146. As a direct and proximate result of the defendants' gross negligence, the decedent attempted to commit suicide on January 9, 2019 and subsequently died on January 11, 2019.

147. As a further direct and proximate result of the medical personnel's gross negligence, the

decedent was caused to suffer grave anxiety, physical suffering, severe mental anguish and pain, and inconvenience, all of which resulted in the decedent's attempted suicide and subsequent death.

### XVI.   COUNT XII: PUNITIVE DAMAGES

148. Paragraphs 1 through 147 are incorporated by reference herein.

149. At all relevant times, the defendants acted with actual malice toward the decedent.

150. Defendants further acted consciously in an unjustifiable, willful, wanton, and reckless disregard of the decedent's rights.  Defendants were aware of their conduct and were also aware from their knowledge of existing circumstances and conditions that their conduct would likely result in physical, mental, financial, emotional injury, and death to the decedent.

151. The defendants either knew, or through the exercise of reasonable care, should have known of the decedent's risk of suicide and their failure to respond appropriately to that risk warrants an award of punitive damages.

152. The creation of jail records after the decedent's suicide in this instance demonstrates the defendants' deliberate indifference and/or gross negligence, warranting the relief requested.

153. As a further direct and proximate result of the defendants' acts and omissions, the plaintiff, by counsel, demands judgment against the defendants, jointly and severally, for compensatory damages in the amount of **FIVE MILLION DOLLARS ($5,000,000.00)** and punitive damages in the amount of **TEN MILLION DOLLARS ($10,000,000.00),** plus all costs and interest as permitted by law.

BARRY MESSINGER, Administrator of the Estate of
PATRICK JOSPEH MESSINGER, deceased

By: _____/s/_____

Katherine M. Lennon, Esquire (VSB No. 92358)
Edward Fiorella, Jr., Esquire (VSB No. 26176)
***Fraim & Fiorella, P.C.***
Town Point Center, Suite 601
150 Boush Street
Norfolk, Virginia 23510
(757) 227-5900
(757) 227-5901 (fax)
klennon@ff-legal.com
efiorella@ff-legal.com
Counsel of Record for the Plaintiff